In re Patrick A. ORECCHIO, Debtor.

**FCC NATIONAL BANK, dba First Card, Plaintiff,**

v.

**Patrick A. ORECCHIO, Defendant.**

**Bankruptcy No. 2–88–01228.
Adv. No. 2–88–0156.**

United States Bankruptcy Court,
S.D. Ohio, E.D.

Nov. 30, 1989.

Richard D. Bringardner, Columbus, Ohio, for plaintiff, FCC Nat. Bank, dba First Card.

William B. Logan, Jr., Columbus, Ohio, for defendant, Patrick A. Orecchio.

Charles M. Caldwell, Office of the U.S. Trustee, Columbus, Ohio.

## OPINION AND ORDER ON COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT

BARBARA J. SELLERS, Bankruptcy Judge.

This matter is before the Court after trial of the merits of a complaint, filed by FCC National Bank, dba First Card ("FCC"). The complaint seeks a determination that certain debts owed FCC by defendant Patrick Orecchio (the "Debtor") are nondischargeable under 11 U.S.C. § 523(a)(2)(A) and (C). The defendant is a debtor in a Chapter 11 case pending before this Court.

The Court has jurisdiction in this matter under 28 U.S.C. § 1334(b) and the General Order of Reference entered in this district. This dischargeability action is a core proceeding which this bankruptcy judge may hear and determine. 28 U.S.C. § 157(b)(2)(I).

## I. FINDINGS OF FACT

The following facts were stipulated by the parties:

1. The Debtor applied for a First Card VISA revolving installment credit card through FCC, formerly known as First Chicago National Bank. That application was accepted with a $5,000.00 credit limit and designated as account number 4673–681–806–261 (the "Account").

2. On or after January 11, 1988, the Debtor used the Account to make a charge of $129.35 to Winter Silks of Middleton, Wisconsin. That charge was posted on January 20, 1988.

3. On or after January 28, 1988, the Debtor used the Account to make a charge of $493.95 to Investor's Hotline of Huntington Valley, Maryland.

4. On February 26, 1988, the Debtor made a $4,000.00 withdrawal for a cash advance from the Account through a Columbus, Ohio office of BancOhio National Bank.

5. On March 8, 1988, the Debtor filed a Chapter 11 petition with this Court.

Testimony and evidence received at trial also established the following facts:

6. On February 24, 1988, the Debtor was arrested and jailed for violating an order of the Court of Common Pleas of Franklin County, Ohio, Domestic Relations Division.

7. On February 25, 1988, a friend of the Debtor posted a $10,000.00 cash bond to secure the Debtor's release from jail.

8. At the time the Debtor made the $4,000.00 cash withdrawal from the Account, he made a similar cash withdrawal for a cash advance from a Master Charge account he had with another bank.

9. The Debtor used the two $4,000.00 cash advances plus $2,000.00 of his own money to repay his friend for the cash bond.

10. In addition to the dispute with his ex-wife relating to unpaid obligations arising from a divorce decree, the Debtor had other legal and financial problems. Specifically, his pizza business had an ongoing lease dispute with the lessor of one location, sales were down in his stores generally, his annual income had decreased from approximately $70,000.00 to $40,000.00, controversies existed with regard to certain other business obligations and he had a large outstanding bill for landscaping services performed for his residence.

11. The Debtor's residence, which has been sold during his Chapter 11 case, was encumbered by a mortgage which carried a monthly obligation of $2,000.00.

12. The purchase from Winter Silks was for various items of ski wear, and the purchase from Investor's Hotline was for audio tapes which recommended strategies for personal investment purposes.

13. An interest charge of $7.17 was assessed to the Account on the February 24, 1988 statement.

14. At the time of the purchases and cash advance, the Debtor was consulting a law firm about his domestic and business affairs. He first saw a bankruptcy attorney from that firm four or five days prior to his bankruptcy filing.

15. The first amended disclosure statement filed by the Debtor in his Chapter 11 case sets forth unsecured obligations, including disputed and contingent liabilities, in a total amount of $755,775.00.

## II. ISSUES PRESENTED

The issues before the Court are:

1. Are the charges for the Investor's Hotline audio tapes, together with the $7.17 in interest charges, consumer debts aggregating more than $500 for luxury goods or services incurred within 40 days of the bankruptcy filing which are presumed to be nondischargeable under 11 U.S.C. § 523(a)(2)(C)?

2. Is the cash advance of $4,000.00 presumed to be nondischargeable under the cash advance provisions of 11 U.S.C. § 523(a)(2)(C)?

3. If either of the presumptions of nondischargeability apply pursuant to 11 U.S.C. § 523(a)(2)(C), have such presumptions been successfully rebutted?

## III. DISCUSSION AND LEGAL ARGUMENTS

### A. The "Luxury Goods" Exception to Discharge

11 U.S.C. § 523(a)(2)(C) provides for a presumption of fraud where a Debtor's obligations to a creditor arise from certain fact patterns. The so-called "luxury goods" portion of that statute states:

> (C) for purposes of subparagraph (A) of this paragraph, consumer debts owed to a single creditor and aggregating more than $500 for "luxury goods or services" incurred by an individual debtor on or within forty days before the order for relief under this title ... are presumed to be nondischargeable; "luxury goods or services" do not include goods or services reasonably acquired for the support or maintenance of the debtor....

11 U.S.C. § 523(a)(2)(C).

■ The Court finds that the purchase of the audio tapes is a consumer debt within the meaning of 11 U.S.C. § 101(7). Such purchase is of a luxury nature as the tapes clearly are not necessary for the Debtor's support. Further, the charge was made within forty days of the Debtor's bankruptcy filing. The only issue remaining, therefore, is whether the charge meets the statutory definition of a debt aggregating more than $500.00.

■ Only the charge for the audio tapes is relevant to this consideration because the Debtor's purchase of ski wear was made outside the 40 day period required to in-

voke the presumption. As the amount of the charge relating to the tapes was $493.95, only if the $7.17 finance charge is added to the charge for the tapes can the threshold level of $500.00 be reached.

 Section 523(a)(2)(C) was added to the Bankruptcy Code as part of the Bankruptcy Amendments and Federal Judgeships Act of 1984. Public Law 98–353, 98 Stat. 333. The amendment recognized that while actual fraud under § 523(a)(2)(A) is difficult to prove, certain actions by a debtor which occur immediately prior to bankruptcy may be strong indicators of fraudulent intent. Without the presumption, however, exceptions to discharge are construed narrowly. Further, in this circuit, the standard of proof required of a creditor seeking to except its obligation from discharge for fraud requires clear and convincing evidence. *Bank of German Town v. Martin (In re Martin)*, 761 F.2d 1163 (6th Cir. 1985); *Coman v. Phillips (In re Phillips)*, 804 F.2d 930 (6th Cir.1986).

The Court believes it would be inappropriate to interpret broadly the threshold amount to invoke the presumption of nondischargeability by adding interest charges from prior purchases made outside the required time period to charges for purchases made within the period for less than the statutory amount. Further, the interest charge itself is not a luxury good or service, but is a fee for delay in repayment. Therefore, the purchase of January 28, 1988 and interest attributable to earlier purchases will not be aggregated to reach the $500.00 limit required to invoke the presumption of nondischargeability.

Accordingly, the Debtor's debt to FCC for luxury goods incurred within the 40 day period does not aggregate more than $500.00 and is, therefore, not within the presumption of § 523(a)(2)(C). As there was no evidence of actual fraud in connection with his purchases, the portion of the obligation to FCC attributable to purchases of goods is dischargeable in the Debtor's bankruptcy case.

### B. *The "Cash Advance" Exception to Discharge*

Section 523(a)(2)(C) of the Bankruptcy Code also contains a presumption of nondischargeability for cash advances taken immediately prior to a bankruptcy filing. That presumption states:

(C) for purposes of subparagraph A of this paragraph, ... cash advances aggregating more than $1,000 that are extensions of consumer credit under an open end credit plan obtained by an individual debtor on or within twenty days before the order for relief under this title are presumed to be nondischargeable....

11 U.S.C. § 523(a)(2)(C).

There is no dispute that the Debtor's withdrawal of $4,000.00, approximately ten days prior to his bankruptcy filing, permits FCC to invoke the presumption. The question presented in this adversary proceeding, however, is whether the Debtor's explanations of his activity successfully rebutted the presumption. If such rebuttal occurred, absent clear and convincing proof by FCC of actual fraud, this portion of his obligation to FCC is also dischargeable.

The Debtor contended that, as an experienced businessman, he had weathered previous periods of prosperity and decline and absolutely believed he could repay the advance. He further testified that he was not contemplating bankruptcy relief at the time the advance was taken, but merely was handling an emergency matter occasioned by his dispute with his former spouse.

Cross-examination of the Debtor's attempted rebuttal, however, demonstrated that the Debtor had legal and financial problems other than just the domestic action initiated by his ex-wife. His pizza businesses were having some financial problems at the time of the advance, including a lease dispute for which he had sought legal assistance. He had a large unpaid debt for landscaping services at his residence and was obligated for a $2,000.00 monthly mortgage payment on an annual gross income of approximately $40,000.00. Documents filed by the Debtor in his Chapter 11 case also show estimated unsecured debts, including contingent and disputed obligations, totalling $755,775.00. Sales in

the Debtor's stores were down in 1987 and early 1988 and one of the stores had been closed prior to the bankruptcy filing.

The Debtor admitted that his financial situation was tight at the time of the cash withdrawal, but stated that he came up with $2,000.00 of his own money to repay part of the bond obligation. He asserted that the legal controversy with his ex-wife was the only one putting pressure on him and that he had either reached agreements with his other creditors or was engaged in ongoing discussions with them. Because the Domestic Relations Court had given him only until March 9, 1988 to pay his ex-wife $40,000.00 or serve an additional 29 days in jail, he consulted with his attorneys on March 4, 1988 and made an offer of settlement to his ex-wife. His consultation with attorneys in relation to a bankruptcy filing was necessitated by the possibility that his ex-wife might reject the settlement offer and he would be unable to meet the March 9 payment.

Congress' motive for adding § 523(a)(2)(C) to the Bankruptcy Code in 1984 was to rectify a perceived practice by debtors of "loading up," or going on credit buying sprees in contemplation of bankruptcy. S.Rep. No. 98–65, 98th Cong. 1st Sess. 58 (1983). The amendment presumes a debtor has incurred debts covered by that subsection without intending to repay them or knowing he cannot repay them. *Norwest Financial Consumer Discount Co. v. Koch (In re Koch)*, 83 B.R. 898 (Bankr.E.D. Pa.1988). The statute does not presume the factors required to invoke the presumption, but merely relieves the creditor from having to prove intent under the related nondischargeability of section 523(a)(2)(A). *Koch*, at 902.

The statute, however, is silent as to whether the presumption can be rebutted, what must be shown for rebuttal, or what results if a debtor successfully rebuts the presumption. The legislative history to the section, however, states that the presumption is rebuttable and that once the presumption has been invoked, "[t]he burden is upon the debtor to demonstrate that the debt was not incurred in contemplation of discharge in bankruptcy and thus a fraudulent debt." S.Rep. No. 98–65, 98th Cong. 1st Sess. 58 (1983). This legislative history indicates that Congress intended the statute to shift a considerable burden to a debtor to show intent to repay a debt otherwise included by the presumption.

The standard for rebuttal of the presumption contained in 11 U.S.C. § 523(a)(2)(C) may be different from the general evidentiary standard for civil presumptions set forth in Rule 301 of the Federal Rules of Evidence which states:

> [I]n all civil actions and proceedings not otherwise provided for by Act of Congress or by these rules, a presumption imposes on the party against whom it is directed, the burden of going forward with evidence to rebut or meet the presumption but does not shift to such party the burden of proof in the sense of the risk of non-persuasion, which remains throughout the trial upon the party of whom it was originally cast.

Fed.R.Evid. 301.

Interpretation of Fed.R.Evid. 301 has been the subject of much heated debate. The most common approach to determine when a presumption under Rule 301 is rebutted is the "bursting bubble" theory. Under that theory, the opponent of the presumption need only introduce evidence sufficient to support a finding contrary to the presumed fact and the presumption disappears. See cases collected at Annotation, *Effect of Presumption as Evidence or Upon Burden of Proof, Where Controverting Evidence Is Introduced*, 5 A.L.R. 3d 19 (1966). This slight burden easily can destroy the usefulness of a presumption.

■ Adapting Fed.R.Evid. 301 to a presumption against the discharge of a particular debt in bankruptcy is not simple. The statutory presumption in the Bankruptcy Code does not specifically substitute another standard for the "bursting bubble" theory. The legislative history cited earlier, however, seems to indicate that a debtor needs to do much more than simply present evidence which could support a contrary result. Rather, the debtor must demon-

strate non-fraudulent intent in connection with that obligation.

■ Reconciliation of the legislative history of § 523(a)(2)(C) and the "bursting bubble" theory of Rule 301 is not impossible. The language from the Senate Report would require a debtor to "demonstrate that the debt was not incurred in contemplation of discharge" while the "bursting bubble" theory would require a debtor only to present evidence sufficient to support a finding contrary to the presumed fact. To harmonize the two requirements, the Court must interpret the sufficiency requirement of the "bursting bubble" theory to mean substantial and believable evidence contrary to the presumed intent. Such evidence need not be of the same clear and convincing nature as the creditor is required to show to invoke the presumption, but the Debtor's rebuttal evidence must raise a substantial doubt in the mind of the trier of fact as to the existence of the presumed intent. Russell, *Bankruptcy Evidence Manual*, § 301,3. Evidence of that nature would satisfy the standard contemplated in the legislative history to 11 U.S.C. § 523(a)(2)(C) as well as the prevailing standard under Fed.R.Evid. 301.

■ The effect of the presumption, therefore, is that if the Debtor's rebuttal is sufficient and believed, FCC must prove actual intent under § 523(a)(2)(A or B) by clear and convincing evidence. If it meets that burden, the debt should be found to be nondischargeable. If the Debtor's rebuttal is unbelievable or insufficient to rebut the presumption, FCC is not forced to prove intent under § 523(a)(2)(A) and the presumption of fraudulent intent and nondischargeability under § 523(a)(2)(C) remain.

FCC has shown by clear and convincing evidence that the Debtor incurred a consumer debt, to a single creditor, for cash advances of more than $1,000.00, under an open end credit plan, within 20 days of the order for relief within the meaning of 11 U.S.C. § 523(a)(2)(C). The Debtor's intention not to pay this debt is, therefore, presumed under that statute.

■ To rebut the presumption, the Debtor was required to raise a substantial doubt in the Court's mind, as the trier of fact, as to the existence of the presumed intent. This he did not do. The Debtor's testimony at the hearing was not convincing and, in some instances, was not believable. His answers to questions were evasive and he repeatedly stated that he "didn't know," "couldn't remember" or would "have to check and supply that information later." He could not even guess what his income was for 1988 within such latitude as "$10,000 or $200,000." As a seasoned businessman, the Debtor should have been able to provide rough answers involving his salary, his business' income, his business' financial decline, the reasons for the decline, and his personal and business legal problems. He did not even correctly answer a question regarding how many stores he had open at the time the cash advance was taken.

It is this Court's opinion that the Debtor failed to raise substantial doubt as to his presumed intent not to repay the debt. We need not decide if this Debtor knew his financial situation was such that he could not repay the obligation. Section 523(a)(2)(C) presumes a debtor's intention not to repay and the Debtor's testimony regarding his financial position at the time he took the cash advance did not successfully rebut the presumption. Mere professions of intent to repay a debt and subsequent consultation with bankruptcy attorneys will not suffice when the Debtor is not credible.

## IV. CONCLUSIONS OF LAW

Based upon the foregoing, the Court finds that the portion of the debt owed to FCC by Patrick Orecchio which represents a cash advance in the amount of $4,000.00 shall be and the same is, hereby excepted from the Debtor's discharge, pursuant to 11 U.S.C. § 523(a)(2)(C). The remainder of the Debtor's obligation to FCC, attributable to the purchase of goods, is discharged.

IT IS SO ORDERED.