In re William Clarke HYMAN, Debtor.

Jack B. MILLS, John R. Parker and Parker Lincoln–Mercury, Inc., Plaintiffs,

v.

William Clarke HYMAN, Defendant.

Bankruptcy No. 96–75579–W.

Adversary No. 97–80128–W.

United States Bankruptcy Court, D. South Carolina.

Jan. 8, 1998.

Mark W. McKnight, Charleston, SC, for Plaintiffs.

---

D. Nathan Davis, Charleston, SC, for Defendant.

## ORDER

JOHN E. WAITES, Bankruptcy Judge.

THIS MATTER comes before the Court for trial upon the complaint of Jack B. Mills, John R. Parker and Parker Lincoln–Mercury, Inc., (collectively the "Plaintiffs" and individually "Mr. Mills", "Mr. Parker" and "Parker Lincoln–Mercury") seeking an order declaring the indebtedness owed by William Clarke Hyman ("Mr. Hyman" or the "Debtor") to the Plaintiffs is non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A).[1]

After receiving the testimony, considering all the evidence and weighing the credibility of the witnesses, the Court makes the following Findings of Fact and Conclusions of Law pursuant to Rule 52 of the Federal Rules of Civil Procedure, made applicable by Rule 7052 of the Federal Rules of Bankruptcy Procedure.[2]

## FINDINGS OF FACT

On January 31, 1991, the parties entered into a series of agreements regarding the purchase by Mr. Hyman and his wholly owned corporation, William Clarke Jeep–Eagle, Inc., now known as William Clarke Motors, Inc., of the Plaintiffs' Lincoln Mercury dealership franchise and assets. Ancillary to the sale were two non-competition agreements with Mr. Parker and Mr. Mills and a lease indemnification with Parker Lincoln–Mercury. No money was exchanged at the initial signing of these agreements but Mr. Hyman's corporation was allowed to take over the interim management of the dealership. At a subsequent formal closing of the transfer of the dealership in June of 1991 and after the final reconciliation of certain credits and debits, Mr. Hyman and his corporation presented a $56,000.00 promissory note which represented the entire balance of the purchase price for the dealership.

Mr. Hyman admits that he signed the lease indemnification agreement and the non-competition agreements; however, when he signed the non-competition agreements, there were several blanks remaining in the agreements including the proper amount of interest to be applied. Mr. Hyman asserts that upon his signing, he thought the remaining issues would be settled between the parties and subsequently filled in and it appears that he primarily relied upon his agent, Mr. Alvin Shuman, who remained at that meeting to finalize the details. Mr. Alvin Shuman was to be principally involved in the day to day operations of Mr. Hyman's dealership. However, the agreements were never amended or supplemented in writing to complete the missing terms.

The blanks in the non-competition agreements include the date of the agreement, the rate of interest to be paid, and the witnesses for Mr. Hyman's signature as well as his address. The omission of the proper rate of interest to apply is of significant importance because the non-competition agreements provided for interest payments only to be paid for the first eighteen (18) monthly payments of the eight (8) year term of the noncompetition agreements. Nevertheless, Mr. Hyman's corporation took over the operations of the dealership and became its owner in June of 1991.

In June of 1992, the Plaintiffs filed a lawsuit against Mr. Hyman and William Clarke Motors, Inc. for, *inter alia*, breach of contract for failing to make any payments pursuant to their agreements. This litigation was eventually referred to arbitration and in May of 1994, the arbitrators awarded the Plaintiffs the amount of $1,221,910.58. Following substantial collection efforts including the appointment of a receiver, in September of 1995, William Clarke Motors, Inc. and William Clarke Properties, Inc. filed voluntary Chapter 11 petitions. In the Spring of 1996, William Clarke Motors, Inc. and William Clarke Properties, Inc. converted to Chapter 7 cases and a Trustee was appointed. In

---

1. Further references to the Bankruptcy Code, 11 U.S.C. § 101, *et seq.*, shall be by section number only.

2. The court notes that to the extent any of the following Findings of Fact constitute Conclusions of Law, they are adopted as such, and to the extent any Conclusions of Law constitute Findings of Fact, they are so adopted.

August of 1996, Mr. Hyman filed his personal Chapter 7 petition. As of July 31, 1996, the total judgment debt owed by the Defendant to the Plaintiffs was $1,218,886.03.

The Plaintiffs brought this action alleging that the debtor obtained goods, money or property by fraud, deceit or misrepresentation pursuant to § 523(a)(2)(A) specifically claiming that Mr. Hyman never intended to pay the Plaintiffs when he signed the non-competition agreements and lease indemnification agreement.

## CONCLUSIONS OF LAW

■ The action before the Court is one that seeks to except the debt owed to the Plaintiffs from discharge pursuant to § 523(a)(2)(A) which states that a "discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." 11 U.S.C. § 523(a)(2)(A).

The Bankruptcy Court for the Middle District of North Carolina has recently reiterated the general test for these type of dischargeability proceedings.

> Courts generally agree that the following traditional elements of fraud must be proven to sustain a claim under § 523(a)(2)(A): (1) That the debtor made a representation; (2) That at the time the representation was made, the debtor knew the representation was false; (3) That the debtor made the false representation with the intention of deceiving the creditor; (4) That the creditor relied on such representation; and (5) That the creditor sustained the alleged loss and damage as the proximate result of the false representation. E.g., *In re Valdes,* 188 B.R. 533, 535 (Bankr.D.Md.1995); *In re Carrier,* 181 B.R. 742, 746 (Bankr. S.D.N.Y.1995). As to the reliance requirement, § 523(a)(2)(A) requires justifiable, but not reasonable reliance. *Field v. Mans,* 516 U.S. 59, 73–76, 116 S.Ct. 437, 446, 133 L.Ed.2d 351 (1995); *In re Burdge,*

198 B.R. 773 (9th Cir. BAP 1996). The objecting creditor has the burden of proving each of the foregoing elements by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991); *In re Stanley,* 66 F.3d 664, 667 n. 4 (4th Cir.1995).

*In re Simos,* 209 B.R. 188 (Bkrtcy.M.D.N.C. 1997). Also see *In re Richardson,* 179 B.R. 791 (Bkrtcy.D.S.C.1994) and *In re Baird,* No. 96–75437–W (Bkrtcy.D.S.C. Oct. 1, 1997) (Unpubl.)

The primary issue before the Court is whether at the time Mr. Hyman represented that he would pay according to the agreements, that he knew the representation was false and undertook it with the intention of deceiving the Plaintiffs. The Plaintiffs take the position that at the time Mr. Hyman entered into these agreements, he never intended to perform his part of the bargain and that this intention to deceive is shown by his failure to make any payments pursuant to the agreements and rises to the level of a false or fraudulent misrepresentation so that the debt should be non-dischargeable pursuant to § 523(a)(2)(A). Mr. Hyman takes the position that at the time he signed the original agreements, he fully intended to abide by their terms; however, as he was required to make interest payments only for the first eighteen (18) monthly payments of the eight (8) year term of the agreements and the interest rate was never settled and remained in dispute, he did not want to make any payments until that issue was resolved.

It is clear that Mr. Hyman made a representation that he would abide by the agreements and the Plaintiffs relied upon that representation in transferring the dealership; however, apart from a fact that Mr. Hyman did not make any voluntary payments pursuant to the agreements, there was no proof that at the time the representation was made by Mr. Hyman, that he knew the representation was false or that he made the representation with the intention of deceiving the Plaintiffs. The general manager of William Clarke Motors in 1991, Mr. Alvin Shuman, who was very involved in the negotiations and present at the signing of the agreements, testified that he and Mr. Hyman discussed

the consequences of signing the agreements individually and that Mr. Hyman expected to be liable if William Clarke Motors did not make the payments. Mr. Shuman also testified that when Mr. Hyman signed the agreements, Mr. Shuman was still in the process of negotiating all of the terms, and that he never thought a final deal was ever reached.

The First Circuit Court of Appeals has recently set forth helpful guidance for the determination of the element of intent at the time of the representation.

"A representation of the maker's own intention to do ... a particular thing is fraudulent if he does not have that intention" at the time he makes the representation. Restatement (Second) of Torts § 530(1); see Anastas v. American Sav. Bank (In re Anastas), 94 F.3d 1280, 1285 (9th Cir.1996). "The state of a man's mind is as much a fact as the state of his digestion." Restatement (Second) of Torts § 530 cmt. a. Likewise, "a promise made without the intent to perform it is held to be a sufficient basis for an action of deceit." W. Page Keeton, et al., Prosser and Keeton on the Law of Torts § 109, at 763 (5th ed.1984) (footnotes omitted); see Restatement (Second) of Torts § 530(1) cmt. c. On the other hand, if, at the time he makes a promise, the maker honestly intends to keep it but later changes his mind or fails or refuses to carry his expressed intention into effect, there has been no misrepresentation. Restatement (Second) of Torts at § 530 cmts. b, d. This is true "even if there is no excuse for the subsequent breach. A debtor's statement of future intention is not necessarily a misrepresentation if intervening events cause the debtor's future actions to deviate from previously expressed intentions." 4 Collier on Bankruptcy ¶ 523.08[1][d], at 523-43.

The test may be stated as follows. If, at the time he made his promise, the debtor did not intend to perform, then he has made a false representation (false as to his intent) and the debt that arose as a result thereof is not dischargeable (if the other elements of § 523(a)(2)(A) are met). If he did so intend at the time he made his promise, but subsequently decided that he could not or would not so perform, then his initial representation was not false when made. See, e.g., In re Anastas, 94 F.3d at 1285; Milwaukee Auction Galleries Ltd. v. Chalk, 13 F.3d 1107, 1109 (7th Cir.1994) (more than mere nonperformance of a contract was necessary to establish misrepresentation); Mellon Bank Corp. v. First Union Real Estate, 951 F.2d 1399, 1410-11 (3d Cir.1991) (same); Craft v. Metromedia, 766 F.2d 1205, 1219, 1221 (8th Cir.1985). Palmacci v. Umpierrez, 121 F.3d 781 (1st Cir.1997).

In this case, the Plaintiffs did not meet their burden of convincing the Court through the testimony and evidence presented, that Mr. Hyman intended to deceive or defraud the Plaintiffs when the agreements were entered into. At the time of the negotiation of the agreements, Mr. Hyman had substantial personal financial resources from which he could have performed the agreements. Mr. Hyman testified that at the time he signed the signature pages of the documents, his net worth was several million dollars and financial statements introduced by the Plaintiffs indicated Mr. Hyman's net worth at various times at between three and six million dollars. Knowing that the Plaintiffs could look to Mr. Hyman's personal assets in the event William Clarke Motors did not perform appears to be one of the reasons that the Plaintiffs did not ask for additional security for the agreements. At trial, Mr. Parker testified that he did not ask for a formal financial declaration from Mr. Hyman because he believed that Mr. Hyman had substantial means.

■ There was no evidence produced by the Plaintiffs of fraudulent documents or fraudulent conduct at the time the agreements were executed and relied upon. The Plaintiffs rest upon the uncontroverted fact that Mr. Hyman never made a voluntary payment pursuant to the agreements. While direct proof of fraudulent intent is almost impossible to show and "the creditor may present evidence of the surrounding circumstances from which intent may be inferred", see Matter of Van Horne, 823 F.2d 1285, 1287 (8th Cir.1987), in this case, the only

circumstantial proof presented by the Plaintiffs was the non-payment. The subsequent inability or even refusal to pay does not conclusively indicate an intention not to pay at the time of the representation. In contrast, the evidence presented by Mr. Hyman indicates that at the time of the agreements he had no reason to defraud or deceive the Plaintiffs. His direct testimony is that he did not intend to defraud or deceive the Plaintiffs and his conduct at the time does not appear inconsistent with his testimony. This Court declines to infer fraudulent intent at the time of the entering of the agreements from the totality of the facts and circumstances of this case including Mr. Hyman's subsequent failure to make payment.[3]

## CONCLUSION

As stated previously, the Plaintiffs have the burden of proof to show all of the elements of § 523(a)(2)(A) and that burden must be shown by the preponderance of the evidence. In this case, it is the finding of the Court that the Plaintiffs have not met that burden. The preponderance of the evidence does not show that at the time Mr. Hyman entered into the transactions with the Plaintiffs that he knew the representations were false or that he made the misrepresentations with the intention and purpose of deceiving the Plaintiffs. In this case, the central issue raised by the pleadings is that Mr. Hyman never intended to pay this indebtedness. The Court has heard the testimony of all of the witnesses and considered both their testimony and their actions both at the time the agreements were signed and subsequent conduct.

Additionally, the Court is mindful that the Bankruptcy Code must be construed in favor of a debtor and one of the main objectives of an individual's Chapter 7 liquidation case is for a debtor to receive a fresh start. *See BFP v. Resolution Trust Corp.*, 511 U.S. 531, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994) (... policies of obtaining a maximum and equitable distribution for creditors and ensuring a

"fresh start" for individual debtors, which the Court has often said are at the core of federal bankruptcy law) and *In re Powell*, 213 B.R. 306 (Bkrtcy.W.D.Va.1997) (the Court notes that the Bankruptcy Code is to be liberally construed in favor of the debtor (citations omitted)).

For all of these reasons, it does not appear that the actions of Mr. Hyman meet the requirements of § 523(a)(2)(A) and judgment must be rendered in favor of Mr. Hyman.

**AND IT IS SO ORDERED.**

---

3. This Court considered the evidence presented that Mr. Hyman and his corporations did not voluntarily pay the indebtedness and further commingled and transferred assets subsequent to the litigation between the parties and the render-ing of judgment. While such transfers may be the subject of fraudulent transfer actions, such subsequent activity does not convince the Court that the requirements of § 523(a)(2)(A) are met.